## UNITED STATES BANKRUPTCY COURT
### FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JULIE A. REGAN**,                                    Chapter 13
    Debtor                                    Case No. 07-12786-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**JULIE REGAN AND WILL REGAN,**
    Plaintiffs
v.                                                   Adv. P. No. 07-1308
**BENEFICIAL MASSACHUSETTS, INC.**
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is "Defendant Beneficial Massachusetts, Inc.'s Motion

for Summary Judgment" with respect to all counts of the seven-count Verified Complaint

filed by  Julie A. Regan (the "Debtor") and her non-debtor spouse, Will Regan

("Regan")(collectively, the "Regans").  The Regans filed an Objection.  The Court heard the

Motion filed by Beneficial Massachusetts, Inc. ("Beneficial") and the Objection filed by the

Regans on July 16, 2008 and took the matter under advisement.

Beneficial included in its Memorandum a Statement of Undisputed Material Facts

in compliance with MLBR 7056-1, which incorporates LR 56.1 of the United States District

Court for the District of Massachusetts.  The Regans failed to comply with MLBR 7056-1.

They did not submit a concise statement of the material facts of record which they contend

1

give rise to genuine issues of material fact with page references to affidavits, depositions, and other documentation. Instead, they submitted an Affirmation in which they responded, virtually sentence by sentence, to the facts and arguments set forth in Beneficial's Memorandum, adding facts in response to arguments, jumbling factual assertions, and failing to set forth a complete and cogent chronology of the material facts from their point of view supported with references to relevant documentary evidence, particularly evidence of the alleged payments they made which were not credited to their loan account with Beneficial. Although LR 56.1 would permit the Court to disregard the Regans' submission, the Court has endeavored to "find" the facts they contend create grounds for denial of summary judgment.

The issue presented by Beneficial's Motion for Summary Judgment is whether the Regans sustained their burden of establishing genuine issues of fact with respect to the seven counts set forth in their Verified Complaint.

## II. BACKGROUND

A. <u>The Debtor's Chapter 13 Case</u>

The Debtor filed a voluntary Chapter 13 petition on May 4, 2007. On Schedule A-Real Property, she listed an ownership interest in property located at 10 Unicorn Circle, Amesbury, Massachusetts (the "Amesbury property") with a value of $285,000, subject to a secured claim in the sum of $320,627.95. She did not disclose whether she was the sole owner or a joint owner of the property. On Schedule D-Creditors Holding Secured Claims, she listed "Beneficial HFC" with a claim in the sum of $320,627.95, and, on Schedule E-

2

Creditors Holding Unsecured Priority Claims, she listed the Town of Amesbury with a claim in the sum of $6,400 for outstanding real estate taxes.  On Schedule H-Codebtors, the Debtor did not list her non-debtor spouse as a co-debtor.

In the Debtor's Chapter 13 case, Beneficial filed a proof of claim to which the Debtor objected, as well as an objection to confirmation of her Chapter 13 plan.  Both of those contested matters have been consolidated with the instant adversary proceeding.  In its proof of claim, Beneficial asserted that it was owed $342,786.93, including an arrearage of $43,182.69.

On July 24, 2007, the Regans filed a Verified Complaint in the Debtor's Chapter 13 case.  Based upon the allegations set forth in their Verified Complaint, the Regans formulated seven counts[1] as follows: Count I - Accounting; Count II - Fair Debt Collection Practices; Count III - Violation of Attorney General's Regulations; Count IV - Breach of Contract; Count VI [sic] - Infliction of Emotional Distress; Count VII - Violation of Servicer Act; and Count VIII - Violation of the Automatic Stay; Breach of Contract.  Specifically, through Count VIII, the Regans sought damages for Beneficial's conduct in Regan's Chapter 13 case, discussed below, in allegedly adding fees and charges to their mortgage loan which were not authorized by the contract or applicable law in breach of contract and in violation of the automatic stay.

B. <u>Will Regan's Chapter 13 Case</u>

Regan, using the name William J. Regan, filed a voluntary Chapter 13 petition on

---

[1] The counts are misnumbered in the Complaint; the Debtor omitted a Count V.

February 9, 2006 (Case No. 06-10262-JNF).  As will be discussed below, the Court takes judicial notice that he also filed  a voluntary Chapter 7 case on July 31, 2007 (Case No. 07-14742-JNF), approximately two months after the Debtor filed her Chapter 13 case.

In his Chapter 13 case, Regan listed the Amesbury property on Schedule A with a value of $400,000.  He attached a quitclaim deed to Schedule A reflecting that he and the Debtor took title to the Amesbury property on February 21, 1992 as tenants by the entirety, although he did not list his spouse as a co-debtor on Schedule H.  Regan also did not list any claims against Beneficial on Schedule B-Personal Property,[2] although he did list a "401(k) Retirement" account with a value of $7,756.78.

Beneficial filed a "Motion for Relief from Automatic Stay and for Relief from Co-Debtor Stay" in Regan's Chapter 13 case on August 30, 2006, as well as an objection to confirmation of his Chapter 13 plan.  In its Motion for Relief from the Automatic Stay, Beneficial set forth a post-petition arrearage in the sum of $5,786.89, exclusive of attorneys' fees, costs and expenses, for the period between June and August 2006.  In a response to the Motion for Relief from the Automatic Stay, Regan denied that averment, but he admitted he was trying to obtain funds to become current with his payments.  Regan also filed an objection to Beneficial's proof of claim on the ground that Beneficial failed to provide documentation in support of fees in the amount of $17,530.01, in addition to arrears set forth in the sum of $15,482.41, which he did not contest.  Beneficial filed an

---

[2] Regan checked "none" with respect to "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims."

4

amended proof of claim on February 28, 2007, setting forth an arrearage of $17,530.01,

$15,792.01 of which it attributed to real estate taxes it paid to the Town of Amesbury.

After numerous continuances, the Court, on March 2, 2007, ordered Regan to cure

all post-petition arrears by May 30, 2007 and to file an amended Chapter 13 plan by April

2, 2007. Although Regan obtained an extension of time within which to file an amended

plan, he failed to do so, and his case was dismissed on April 24, 2007.  The Debtor filed her

Chapter 13 petition ten days later.

C. Will Regan's Chapter 7 Case

As noted above, Regan filed a  Chapter 7 case on July 31, 2007,  approximately three

months after the Debtor filed her Chapter 13 case, and a week after the commencement of

this adversary proceeding.   Regan listed the Amesbury property on Schedule A with a

value of $320,678, subject to a secured claim held by Beneficial in the sum of $275,908, the

reverse of what the Debtor listed on Schedule A.   He did not list any claims against

Beneficial on Schedule B-Personal Property,[3] although he did list a "401(k) Retirement"

account with a value of $7,756.78.  The Chapter 7 trustee appointed to administer Regan's

Chapter 7 case filed a Report of No Distribution on October 28, 2007, and Regan received

a discharge on November 29, 2007.  His Chapter 7 case is closed.

D. Facts

From the Regans' Verified Complaint and Affirmation, as well as the Statement of

---

[3] Regan checked "none" with respect to "Other contingent and unliquidated
claims of every nature, including tax refunds, counterclaims of the debtor, and rights to
setoff claims."

Undisputed Material Facts incorporated in Beneficial's Memorandum, the Court finds the following the facts.  On April 22, 2003, the Regans entered into a "Loan Repayment and Security Agreement" (the "note") with Beneficial, which, in their view was "a conventional 30-year mortgage loan" with a principal of $284,543.96, an interest rate of 8.75%, and monthly payments of $2,372.88.[4]  In 2003, after the execution of the note and mortgage, the Debtor lost her job at Verizon which paid approximately $85,000 per year.  Although she obtained other employment as a teacher, her salary has not been commensurate with what she earned at Verizon.

In June of 2005, the Town of Amesbury advised the Regans, in writing, that it intended to foreclose a tax lien on the Amesbury property.  According to the Regans, the amount of the lien was $15,892.01.  Beneficial paid the taxes, resulting in dismissal of the tax foreclosure proceeding.

The Regans began seeking refinancing in order to reimburse Beneficial for its payment of the real estate taxes.  In September of 2005, Beneficial notified the Regans that it would commence foreclosure proceedings unless they paid it $5,000 before the end of the month.  According to the Regans, they paid Beneficial $5,000 on September 30, 2005. Additionally, the Regans began discussions with Beneficial about "how to pay the

---

[4] The payment figure set forth in the note included a life insurance premium of $134.37.  When that figure is subtracted from the monthly payment, the result is $2,238.51.  The Regans appear not to have paid the life insurance premium.  The note provided that beginning on the 13th month and continuing annually thereafter for twelve years, the interest rate could be reduced by one-quarter of one percent if there were no late payments in the preceding twelve months.  It also contained a prepayment penalty.  The note did not memorialize a conventional 30-year mortgage loan.

6

remaining balance."[5]  They alleged that a Beneficial employee indicated that they would be required to pay $1,457.08 per month, in addition to their regular monthly mortgage payment, to satisfy the additional indebtedness arising form Beneficial's payment of the Regans' real estate taxes.  According to the Regans, "[d]uring the negotiations, Beneficial made representations that once the plaintiffs were caught up, Beneficial would refinance the mortgage."

The Regans, in their Verified Complaint, further alleged that, beginning in May of 2005 and continuing through October of 2005, they paid Beneficial the sum of $18,423.53,[6] payments which required them to "liquidate their 401k accounts and employ every possible resource available,"[7] including filing Chapter 13 petitions and seeking financial assistance from friends and relatives.

In October of 2005, the Regans signed a forbearance agreement with Beneficial. Although they indicated that it was attached as an exhibit to their Verified Complaint, it

---

[5] The reference to "the remaining balance" is unclear as it could be construed as a reference to the amount of additional indebtedness resulting from Beneficial's payment of the outstanding real estate taxes or the entire loan balance.

[6] The Regans' reference to payment of the sum of $18,423.53 is inconsistent with a later claim in their Affirmation that Beneficial failed to account for five payments totaling $17,392.55.  The Regans did not specifically state that they paid this sum in addition to their regular monthly payment or that this sum was paid to satisfy the additional debt arising from payment of the tax lien.  The $18,423.53 sum is less than what was required for their regular monthly mortgage payments ($2,372.88 x 6 = $18,983.04), but it could have satisfied the amount due for payment of the tax lien.

[7] Regan apparently did not liquidate his 401k account as he listed it as an asset on Schedule B in his Chapter 7 case.

was not.  The Agreement, however,  was attached as an exhibit to Beneficial's Motion for

Summary Judgment.  Set forth on the letterhead of the law firm of Shechtman Halperin

Savage LLP ("SHS"), the agreement provided the following:

> The loan is currently in arrears for a total amount of $17,485.01 (the
> "Arrearage").  This figure is comprised of monthly mortgage payments due
> and owing in the amount of $4,286.86; tax payment advanced to the Town of
> Amesbury in the amount of $15,892.01 and legal fees and expenses due and
> owing in the amount of $1,593.00.

> On September 30, 2005, you delivered to your local Beneficial branch, cash
> in the amount of $5,000.00, which has been applied to the Arrearage by
> Beneficial in its sole discretion.

> ***

> If you fail to make any payments when due or fulfill any obligation under
> the Loan Documents or this Agreement, Beneficial will be free to resume
> foreclosure proceedings without further prior notice. . . .

> In consideration of Beneficial's agreement as set forth herein and for other
> valuable consideration, the receipt of which is acknowledged by you, you
> hereby agree to release Beneficial, its parents, subsidiaries, predecessors,
> affiliates, officers, directors, shareholders, attorneys and agents from any and
> all claims and defenses arising out of or related to your loan.  You have
> further acknowledged that Beneficial's willingness to enter into this
> Agreement shall not operate as a waiver of any right, remedy, power or
> privilege that may be available to Beneficial in the future under the terms of
> your loan Documents or under applicable law.

Although the Regans did not believe they could make the payments required under the

agreement, they executed it anyway, and, in so doing, admitted to an arrearage of

$17,485.01 and released Beneficial of claims arising out of their loan.  In their Affirmation,

they stated:

> . . . [T]he plaintiffs made it clear to Beneficial (Julie Galton) that they could
> not sustain these payments for any extended period of time.  Julie Galton

8

> advised Julie Regan that if the plaintiffs could make some payments under
> the forbearance agreement then Beneficial would refinance them into a lower
> mortgage.  Julie Galton advised the Regan's [sic] that she could not disclose
> what the refinance would look like b/c [sic] she was prohibited under law.
>
> When executing the agreement Julie Regan advised SHS (Brian Hachey) that
> the dollar figures in the agreement were incorrect and as a result we needed
> SHS to reissue a new letter.  SHA [sic] instructed the plaintiffs to sign the
> document anyways [sic].  Julie Regan also expressed a concern about the
> terms of the agreement and made it clear to SHS that JG said this would be
> a short term situation . . . .

The Regans alleged that, pursuant to the agreement, they made a payment for October and

a mortgage payment only for November.  They stated in their Affirmation that they

contacted Julie Galton to apprise her of the situation, and she suggested that Regan contact

his mother to have the overdue payment put on her credit card, a proposal rejected by the

Regans.

The Regans also alleged that about the same time as they executed the forbearance

agreement, an entity by the name of Manhattan Financial informed them that "refinancing

was a possibility."  A month later, however, a representative of Manhattan Financial told

them that their credit report showed that they had made no mortgage payments in five

months.  In response, the Regans contacted Beneficial in an attempt to correct the credit

report and obtain a payment history because, in their view, they had made payments

which had not been credited to their loan account.  The Regans asserted that the following

five payments that Manhattan Financial "referenced as not showing up on our credit

report" were in dispute.

| Date | Amount | Balance |
| --- | --- | --- |

9

| | | |
|---|---|---|
| 1-31-05 | $1,200.00 | $278,835.35 |
| 5-16-05 | $2,238.51 | $278,835.35 |
| 6-29-05 | $2,238.51 | $278,835.35 |
| 8-30-05 | $6,715.53 | $278,835.35 |
| 9-7-05 | $5,000.00 | $278,835.35 |

According to the Regans, Beneficial did not respond to their request for a payment history.  In their Affirmation, the Regans stated that "[o]n 11/22 Will Regan called the Beneficial branch office requesting the payment history and payoff figure for our account. He was told by Beneficial that the information would take 3-5 business days to provide. We requested that the information be released directly to our agent Manhattan Financial Services."  The Regans also stated that in December of 2005 Manhattan Financial received a payoff figure but not a payment history.  According to the Regans,

> [P]laintiffs made repeated requests via the 1-800 number and through fax requests.  The plaintiff [sic] also called Julie Galton as well and their phone calls went unreturned. W. Regan was directed to submit a request in writing and fax the request over.

At her deposition, the Debtor was shown an exhibit, namely a fax cover sheet sent by Regan to Beneficial in which he stated: "Please provide pay off figure and payment history to Att Maryanne @ Manhattan Financial. . . ."  The fax cover sheet contained the notation "2nd Request."  The cover sheet was undated, and the Debtor could not testify at her deposition when it was transmitted to Beneficial.

Because the Regans could not obtain a payment history, they engaged Attorney Jon Kurland who wrote to Julie Galton at Household Finance Company on January 9, 2006. The Regans attached the letter he wrote to their Affirmation, stating that they "thought [it was] to be a 93 demand letter."  The letter provided:

10

Be advised that I have been consulted and retained by the above-named individuals regarding numerous requests for a payment history for the above-referenced account over the past six (6) weeks. Demand is made for you to produce the payment history for this loan within seven (7) business days.

AUTHORIZATION

We, William Regan and Julie Regan authorize you to forward to our attorney, Jon H. Kurland this account information *as well as any additional information he may request in the future*. A facsimile copy of our signatures shall be considered valid and no repercussions shall inure for responding to a photocopied of facsimile transmission containing our signatures herein [sic].

The refusal to provide this information for six (6) weeks after numerous requests from my clients and Mary Ann Hoyland, their representative, is unconscionable. This is particularly so inasmuch as it appears as though you have failed to credit my clients with some substantial payments. My clients are unable to ascertain the true state of their account without that information. Moreover, if you have failed to credit their account, this information is necessary to provide you with the information that you would need to correct their account. My clients have been acting in good faith by paying $9,000.00 in September in response to your representations regarding the status of their account. Since then it appears as though you are reluctant to respond to my clients' inquiries and concerns. In the event that you fail to contact the undersigned or fail to produce the requested information, I shall take all measures necessary to protect and preserve my clients' rights. I trust that you understand our position in this matter.

On January 13, 2006, the Regans received a registered letter from Beneficial informing them of its intention to foreclose its mortgage. The next day, a sheriff served the foreclosure complaint on the Regans' 15 year old son. According to the Regans, they wrote to the law firm of SHS "contesting the foreclosure activity and also complaining about

Beneficial's failure to respond to their information requests."[8]

On January 18, 2006, Julie Galton, at "HFC/Beneficial" faxed Attorney Kurland a "payment history" which, according to the Regans, "neither attorney Kurland nor the plaintiffs initially could understand and was not responsive to their requests." SHS, in a letter to Attorney Kurland dated February 4, 2006, also acknowledged the Regans' request for a loan history and sent a copy of the payment history provided by its client to Attorney Kurland, advising him that it would not respond directly to the Regans' letter in which they contested the foreclosure activity because they had retained him to represent them.

After deciphering the loan history, the Regans alleged that they "discovered that payments in the amount of $16,192 had never been credited to their account, whether to principal or interest."[9] According to the Regans, neither SHS nor Beneficial returned their telephone calls after mid-January 2006. Regan filed his Chapter 13 on February 9, 2006,[10] approximately two weeks after SHS communicated with Attorney Kurland. The Regans also alleged that Regan filed a First Amended Chapter 13 plan setting forth a prepetition arrearage amount of $17,530.01 and a post-petition arrearage of $5,476 which was caused by a temporary interruption in Regan's commission income. The Regans noted, as set forth

---

[8] Beneficial attached a copy of the letter dated January 17, 2006 to the Debtor's deposition. In the letter, they stated that they were contesting the foreclosure for two reasons, one of which was Beneficial's failure to provide a payment history.

[9] As noted above, the Regans, in their Affirmation, listed five payments, totaling $17,392.55, that allegedly did not show up on their credit report.

[10] The Regans erroneously alleged the date was March 10, 2006.

above, that Beneficial filed both a proof of claim in Regan's Chapter 13 case asserting a secured claim in the sum of $320,627.95 and an objection to confirmation setting forth a prepetition arrearage of $33,021.42.

Ten days after Regan's Chapter 13 case was dismissed, the Debtor filed her Chapter 13 case. The Regans emphasized the disparity between the amounts set forth in the proofs of claim filed in Regan's Chapter 13 case ($320,627.95) and the Debtor's Chapter 13 case ($342,786.93).

Beneficial produced a payment history, as of June 4, 2007, which was shown to the Debtor at her deposition and attached to the deposition transcript which it submitted in support of the Motion for Summary Judgment. The payment of the real estate taxes appears on that document in the sum of $15,940.32.[11] According to Beneficial, neither the Debtor nor Regan could identify any specific payment that had not been credited to their loan account during their depositions. Additionally, according to Beneficial, they could not identify a single charge or fee that was improper under the contract or applicable law.

The payment history sent to Attorney Kurland in January of 2006 reflected all five payments which the Regans alleged did not appear on their credit report. With respect to the payments made in June and August of 2005, the letter "v" follows a cursory description of the transaction. The payment history showing loan payments through June 4, 2007, attached as Exhibit 9 to the Debtor's deposition transcript, reflected credit for all but the

---

[11] The Court has no explanation for the $48.31 discrepancy between that figure and the amount set froth in the Regans' Verified Complaint ($15,892.01).

13

two payments made in June and August of 2005 which were followed by the letter "v."

The Debtor testified at her deposition that she kept a time line of "when we made payments and under what circumstances," as well as some receipts. The Regans did not attach the time line to their Affirmation, and they did not attach a copy of a single canceled check or receipt establishing that they, in fact, made the $2,238.51 payment on June 29, 2005 or the $6,715.53 payment on August 30, 2005 in good funds. Indeed, although the Debtor's deposition took place on March 24, 2008 and although the Regans, at that time, had both the payment history provided to Attorney Kurland, as well as the June 4, 2007 payment history produced by Beneficial at the Debtor's deposition, they did nothing between then and the June 30, 2008 deadline for filing a response to Beneficial's Motion for Summary Judgment, to establish what payments they made in good funds that do not appear on the June 4, 2007 payment history. To repeat, the Regans did not produce a single copy of a certified check, bank check, cancelled check, personal check or other form of payment or receipt showing that they made the June 29, 2005 payment in the sum of $2,238.51, the August 30, 2005 payment in the sum of $6,715.53, or any other payment, which they maintain was not been credited to their account.

## III. DISCUSSION

### A. Regan's Status as a Co-Plaintiff and Count VIII

The Court *sua sponte* dismisses Regan as a co-plaintiff in the proceeding for failing to list his contingent, unliquidated claim against Beneficial in his Chapter 7 bankruptcy case, a case which was not disclosed in the Verified Complaint or Memorandum in Support

of Plaintiffs' Objection to Defendant's Motion for Summary Judgment.  As a consequence,

Regan is estopped from asserting claims against Beneficial, and Beneficial is entitled to

judgment against Regan as a matter of law on all counts of the Verified Complaint.

Regan did not disclose any claims against Beneficial on Schedule B in either Case

No. 06-10262-JNF or Case No. 07-14742-JNF, which he filed on July 31, 2007, approximately

one week after he and the Debtor commenced the instant adversary proceeding against

Beneficial.  As noted above, Regan obtained a discharge on December 3, 2007 after the

trustee filed a Report of No Distribution.

In <u>Sullivan v. Decision One Mortgage (In re Sullivan)</u>, 346 B.R. 4  (Bankr. D. Mass.

2006), this Court considered a factual scenario analogous to the one present in this

proceeding.  Indeed, counsel to the Regans in this adversary proceeding was counsel to the

debtor in <u>Sullivan</u> and was provided a copy of the Court's decision in that case which was

issued on July 21, 2006 almost one year before Regan filed his Chapter 7 petition.   In

<u>Sullivan</u>, this Court stated:

> This Court is empowered to take judicial notice of its own records, *see* <u>Xytest
> Corp. v. Mitchell (In re Mitchell)</u>, 255 B.R. 97, 104 (Bankr. D. Mass.
> 2000)(citing <u>In re Nail</u>, 195 B.R. 922, 924 n. 3 (Bankr. N.D.Ala. 1996); <u>In re
> Bestway Products, Inc.</u>, 151 B.R. 530, 540 (Bankr. E.D. Cal. 1993), *aff'd,* 165
> B.R. 339 (9th Cir. BAP 1994)), and has done so. In reviewing the Debtor's
> prior Chapter 7 case, the Court has determined that the Debtor failed to list
> causes of action against the Lenders on Schedule B.
>
> In <u>Payless Wholesale Distributors, Inc. v. Alberto Culver (P.R.), Inc.</u>, 989 F.2d
> 570 (1st Cir.1993), *cert. denied* , 510 U.S. 931, 114 S.Ct. 344, 126 L.Ed.2d 309
> (1993), the Plaintiff/Chapter 11 debtor failed to list causes of action against
> Alberto Culver (P.R.), Inc. and others both in its schedules and in its
> disclosure statement. After exiting bankruptcy, it sued Alberto Culver and
> others for substantial monetary damages. The United States Court of

15

Appeals for the First Circuit expressed its outrage at Payless's conduct and dismissed its suit against the defendants. The court stated:

> The basic principle of bankruptcy is to obtain a discharge from one's creditors in return for all one's assets, except those exempt, as a result of which creditors release their own claims and the bankrupt can start fresh. Assuming there is validity in Payless's present suit, it has a better plan. Conceal your claims; get rid of your creditors on the cheap, and start over with a bundle of rights. This is a palpable fraud that the court will not tolerate, even passively. *See, e.g.,* In re H.R.P. Auto Center, Inc., 130 B.R. 247, 253-54 (Bankr. N.D. Ohio 1991) (collecting cases). Payless, having obtained judicial relief on the representation that no claims existed, can not now resurrect them and obtain relief on the opposite basis. This may not be strictly equitable estoppel, as the court observed. Indeed, defendants may have a windfall. However, it is an unacceptable abuse of judicial proceedings.

989 F.2d at 571. *See also* Jeffrey v. Desmond, 70 F.3d 183 (1st Cir.1995); Leary v. Miller (In re Leary), 241 B.R. 266, 272-73 (Bankr. D. Mass.1999).

Sullivan, 346 B.R. at 31-32. Because Regan obtained a discharge based upon his disclosure on Schedule B that he had no claims against Beneficial in his Chapter 7 case, the Court finds, based upon the decisions in Payless and Sullivan, that he is judicially estopped from asserting claims against Beneficial in this proceeding. Accordingly, the Court shall enter an order dismissing him as a co-plaintiff in this proceeding and entering judgment in favor of Beneficial on all counts of the Complaint. Moreover, the Court shall enter judgment in favor of Beneficial and against the Debtor on Count VIII as she failed to establish her standing to seek relief for a stay violation in Regan's Chapter 13 case and to demonstrate that she was injured by any such stay violation in view of the objection she filed, in her own Chapter 13 case, to the proof of claim filed by Beneficial.

16

B. <u>Standard for Summary Judgment</u>

_____This Court set out the standard for summary judgment in <u>Sullivan</u>, referencing

<u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760 (1st Cir. 1994).

> "It is apodictic that summary judgment should be bestowed only when no
> genuine issue of material fact exists and the movant has successfully
> demonstrated an entitlement to judgment as a matter of law. *See* Fed.R.Civ.P.
> 56(c). As to issues on which the movant, at trial, would be obliged to carry
> the burden of proof, he initially must proffer materials of evidentiary or
> quasi-evidentiary quality-say, affidavits or depositions-that support his
> position. *See* <u>Lopez v. Corporacion Azucarera de Puerto Rico</u>, 938 F.2d 1510,
> 1517 (1st Cir. 1991); <u>Bias v. Advantage Int'l, Inc.</u>, 905 F.2d 1558, 1560-61
> (D.C.Cir.), *cert. denied*, 498 U.S. 958, 111 S.C[t]. 387, 112 L.Ed.2d 397 (1990); cf.
> <u>Mendez v. Banco Popular de Puerto Rico</u>, 900 F.2d 4, 7 (1st Cir. 1990) ("The
> mere fact that plaintiff failed to file a timely opposition does not mean that
> defendant's Rule 56 motion should be granted"). When the summary
> judgment record is complete, all reasonable inferences from the facts must
> be drawn in the manner most favorable to the nonmovant. *See, e.g.*, <u>Morris
> v. Government Dev. Bank</u>, 27 F.3d 746, 748 (1st Cir. 1994); <u>Garside</u>, 895 F.2d
> at 48; <u>Greenburg v. Puerto Rico Maritime Shipping Auth.</u>, 835 F.2d 932, 934
> (1st Cir. 1987). This means, of course, that summary judgment is
> inappropriate if inferences are necessary for the judgment and those
> inferences are not mandated by the record. *See* <u>Blanchard v. Peerless Ins. Co.</u>,
> 958 F.2d 483, 488 (1st Cir. 1992) (warning that summary judgment is
> precluded "unless no reasonable trier of fact could draw any other inference
> from the 'totality of the circumstances' revealed by the undisputed
> evidence")."

<u>Sullivan</u>, 346 B.R. at 18 (quoting <u>Desmond v. Varrasso</u>, 37 F.3d at 763 (footnote omitted)).

In <u>Desmond v. Varrasso</u>, in a footnote, the First Circuit cautioned: "As to issues on which

the nonmovant [the Debtor in this case] has the burden of proof, the movant need do no

more than aver 'an absence of evidence to support the nonmoving party's case.' The

burden of production then shifts to the nonmovant, who, to avoid summary judgment,

must establish the existence of at least one question of fact that is both 'genuine' and

'material.'" <u>Desmond v. Varrasso</u>, 37 F.3d at 763 n. 1. (citations omitted).

C. <u>Counts II and III</u>

In Count II, the Debtor alleged that Beneficial, as a creditor and a debt collector within the meaning of 940 Mass. Code Regs. 7.03, made "false and/or misleading representations as to the amount owed to it, in the papers filed in this court," and those misrepresentations "constitute an unfair and/or deceptive act or practice within the meaning of the regulation." The Regans did not specify the "papers" to which they referred, although the Court presumes the Regans were referring to the proof of claim filed by Beneficial which set forth a prepetition arrearage of $43,182.69 and a total claim of $342,786.93.

In Count III, the Regans referenced 940 Mass. Code Regs. 8.06(1), complaining that Beneficial made false and misleading representations as to the availability of refinancing if they succeeded in curing mortgage arrears, when it never intended to refinance the transaction and "wrongfully deceived the plaintiffs into acting based on the false representations."[12] The Regans did not indicate what specific actions they took in reliance

---

[12] Section 8:06(1) provides:
(1) It is an unfair or deceptive act or practice for a mortgage broker or lender to make any representation or statement of fact if the representation or statement is false or misleading or has the tendency or capacity to be misleading, or if the mortgage broker or lender does not have sufficient information upon which a reasonable belief in the truth of the representation or statement could be based. Such claims or representations include, but are not limited to the availability, terms, conditions, or charges, incident to the mortgage transaction and the possibility of refinancing. In addition, other such claims and representations by the broker may include the amount of the brokerage

on the representations.

As noted, the Regans referenced Massachusetts regulations in Counts II and III in seeking damages for unfair and deceptive acts or practices.   Section 2(a) of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 1 - 11, makes unlawful unfair or deceptive acts or practices in the conduct of any trade or commerce.  Id. at § 2(a).  Section 2(c) of the Consumer Protection Act , authorizes the Attorney General to adopt regulations for the purposes of interpreting the general prohibition against unfair and deceptive acts or practices. Id. at § 2(c).

> Massachusetts law regulates the collection of consumer debts in three major ways. First, creditors of consumers, and their attorneys and assignees, are subject to a general debt collection statute which prohibits the collection of a debt in an unfair, deceptive or unreasonable manner; in addition, the statute prohibits several specified collection activities.

> Second, creditors and their attorneys and employees, are also subject to detailed regulations of numerous collection activities found in the Attorney General's debt collection regulations issued under the authority of the Consumer Protection Act.

> Third, collection agencies are subject to a nearly identical set of regulations issued by the Commissioner of Banks pursuant to statutory authority.

> ***

> The chief remedy available to a consumer debtor who is injured or adversely affected by a debt collector's violation of any of these statutes or regulations

---

> fee, the services which will be provided or performed for the brokerage fee, the borrower's right to cancel any agreement with the mortgage broker, the borrower's right to a refund of the brokerage fee, and the identity of the mortgage lender that will provide the mortgage loan or commitment.

940 Mass. Code Regs. 8:06(1).

19

governing collection activities is a private action under the Consumer Protection Act. The general debt collection statute explicitly states that a failure to comply with its provisions shall constitute an unfair or deceptive act or practice under the Consumer Protection Act. *The administrative debt collection regulations are laws intended to provide consumers with protection, and therefore any violation of their provisions also constitutes an unfair or deceptive act or practice under the Consumer Protection Act. . . .*

*See generally* Howard J. Alperin and Roland F. Chase, *Action under Consumer Protection Act*, 36 Mass. Prac. § 20:120 (2007-2008)(emphasis supplied).

Thus, the Regans' claims for unfair debt collection practices and false and misleading representations about the availability of refinancing fall within the ambit of the Consumer Protection Act.  A prerequisite for relief under the Consumer Protection Act, however, is a written demand for relief mailed or delivered at least 30 days prior to the filing of an action. *See* Mass. Gen. Laws ch. 93A, § 9(3). *See also* Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704-05 (1975).  The Regans failed to satisfy Chapter 93A's requirement of a demand letter for purposes of Counts II and III.

Attorney Kurland's letter contained no reference whatsoever to ch. 93A or to the alleged promise of refinancing.  In his letter, he made a demand on Beneficial's servicer, Household Finance Company, "to produce the payment history for this loan within seven (7) business days."  He stated that its refusal to produce the information for six weeks was unconscionable, and he expressed his intention to "take all measures necessary to protect and preserve my clients' rights." As was the case in Cassano v. Gogos, 20 Mass. App. Ct. 348 (1985), "[n]othing . . . characterize[d] the claim as one under the consumer protection statute," Id. at 350, and neither the injury to the Regans nor the amount of monetary loss

was stated with specificity.  In <u>Cassano</u>, the court stated:

> There is missing from the letter relied upon: (1) any express reference to c.
> 93A; (2) any express reference to the consumer protection act; (3) any
> assertion that the rights of the claimants *as consumers* have been violated; (4)
> any assertion that the defendant has acted in an unfair or deceptive manner
> (G.L. c. 93A, § 2[ a ] ); (5) any reference that the claimants anticipate a
> settlement offer within thirty days (to the contrary, the letter demands action
> within one week, a response which c. 93A, § 9[3], does not require); or (6) any
> assertion that the claimant will pursue multiple damages and legal expenses,
> should relief be denied. We are of opinion that in order to qualify as a
> written demand under c. 93A, a letter must, in addition to defining the injury
> suffered and the relief sought, mention at least one of the six factors we have
> enumerated (or contain some other signal which will alert a reasonably
> perceptive recipient). Otherwise, the potential defendant is without warning
> that the claimant intends to invoke the heavy artillery of c. 93A, i.e., multiple
> damages and the imposition of counsel fees.

<u>Id.</u> at 651 (emphasis supplied).   In <u>Spring v. Geriatric Auth. of Holyoke</u>, 394 Mass. 274

(1985), the court stated that it was "essential that the complainant define the injury suffered

and the relief demanded in a manner that provides the prospective defendant with 'an

opportunity to review the facts and the law involved to see if the requested relief should

be granted or denied' and enables him to make 'a reasonable tender of settlement.'" <u>Id.</u> at

288.

Although Attorney Kurland stated that "it appears as though you have failed to

credit my clients with some substantial payments," he subsequently qualified his language

by observing that "*if* you have failed to credit their account . . . " (emphasis supplied), an

apparent recognition that the Regans may not have made all required payments, were in

arrears, and had breached the forbearance agreement.   Attorney Kurland's lack of

specificity with respect to the injury suffered, coupled with the lack of any reference to ch.

21

93A, to the Regans as consumers, to a settlement offer, or to multiple damages and attorneys' fees warrants the conclusion that the January 9, 2006 letter failed to satisfy the requirements of Mass. Gen. Laws ch. 93A, § 9(3).  The letter was in the nature of a qualified written request for purposes of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. §§ 2601-2617; it was not a ch. 93A demand letter.

In Count III, the Regans asserted that even if the regulation they cite is inapplicable they were wrongfully deceived into action based upon Beneficial's false and misleading representations about the availability of refinancing.  It is well-settled, however, that such a representation about future events is not actionable. *See* <u>Saxon Theatre Corp. of Boston v. Sage</u>, 347 Mass. 662, 667 (1964).

D. <u>Count VII</u>

Through Count VII, the Regans  alleged that Beneficial violated the provisions of § 2605(e) of RESPA.  That section provides:

> (e) Duty of loan servicer to respond to borrower inquiries
>> (1) Notice of receipt of inquiry
>>> (A) In general
>>> If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.
>>> (B) Qualified written request
>>> For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment

coupon or other payment medium supplied by
the servicer, that--

> (i) includes, or otherwise enables
> the servicer to identify, the name
> and account of the borrower; and
> (ii) includes a statement of the
> reasons for the belief of the
> borrower, to the extent applicable,
> that the account is in error or
> provides sufficient detail to the
> servicer regarding other
> information sought by the
> borrower.

(2) Action with respect to inquiry

Not later than 60 days (excluding legal public holidays,
Saturdays, and Sundays) after the receipt from any borrower
of any qualified written request under paragraph (1) and, if
applicable, before taking any action with respect to the inquiry
of the borrower, the servicer shall--

> (A) make appropriate corrections in the account
> of the borrower, including the crediting of any
> late charges or penalties, and transmit to the
> borrower a written notification of such
> correction (which shall include the name and
> telephone number of a representative of the
> servicer who can provide assistance to the
> borrower);
> (B) after conducting an investigation, provide the
> borrower with a written explanation or
> clarification that includes–
>
> > (i) to the extent applicable, a
> > statement of the reasons for which
> > the servicer believes the account of
> > the borrower is correct as
> > determined by the servicer; and
> > (ii) the name and telephone
> > number of an individual employed
> > by, or the office or department of,
> > the servicer who can provide
> > assistance to the borrower; or
>
> (C) after conducting an investigation, provide
> the borrower with a written explanation or

23

> clarification that includes–
>> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
>> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.
>
> (3) Protection of credit rating
>
> During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of Title 15).

12 U.S.C. § 2605(e).  Specifically, the Regans asserted that "inquiries they made, both individually and through attorney Kurland were Qualified Written Requests" and that Beneficial did not acknowledge "the request" within the time provided by the statute.  The Regans, however, failed to submit copies of any qualified written requests other than Attorney Kurland's letter, although Beneficial submitted an undated fax cover sheet from Regan containing a request for a payment history.  Because that request was undated, it is impossible to compute the 20 or 60-day period within which Beneficial was required to respond to it.  Thus, the only qualified written request that exists is Attorney Kurland's January 9, 2006 letter.  The Regans admitted in their Verified Complaint that "on January 18, 2006, Beneficial [sic] faxed to attorney Kurland a 'loan history,' although neither they nor Attorney Kurland were initially able to decipher it."   Although the Regans and

24

Attorney Kurland may have been unsatisfied with the payment history, Attorney Kurland

did not follow up with a request for additional information, although he reserved his right

to do so in his letter, and Regan filed his Chapter 13 petition about three weeks after receipt

of the original payment history, effectively putting any refinancing transaction in abeyance.

Because Beneficial responded within the statutory time period to Attorney Kurland's letter,

the Court finds that it is entitled to summary judgment on Count VII.

E. Count VI

Through Count VI, the Regans demanded damages for infliction of emotional

distress, stating that "the stress and anxiety caused the plaintiffs to lose sleep, to have

feelings of insecurity, frustration, hopelessness and anger, and to feel demoralized and

fearful of losing their home without justification, even though they have done everything

they could to resolve the problem."

Beneficial moved for summary judgment on Count VI, noting that the Regans failed

to identify whether the infliction of emotional distress was intentional or negligent, and

stating that the Regans failed to allege physical injury.  In addition to the absence of any

evidence of severe emotional distress, Beneficial also argued that the Regans offered no

testimony or evidence establishing a causal connection linking their distress with

Beneficial's conduct.

In response, the Regans argued that Beneficial's inaction in supplying them with a

payment history compromised them "both financially and emotionally."  They added that

they were forced into bankruptcies to protect their home until a full accounting of their

payments was made available, that they experienced stress when their son was served with papers by the sheriff, that the Debtor had to "hawk" her engagement ring, and that "[p]laintiff [sic] has had to forego required dental care (as oral cancer survivor) because it is currently cost prohibitive," and that their car was repossessed.

Because the Court has determined that Beneficial is entitled to summary judgment with respect to Counts II, III, and VII, the Regans are not entitled to actual damages for emotional distress as a component of any statutory violation.  *See* Hart v. GMAC Mortgage Company (In re Hart), 246 B.R. 709, 732 (Bankr. D. Mass. 2000)(citing Smith v. Law Offices of Mitchell N. Kay, 124 B.R. 182, 185 (Bankr. D. Del. 1991)).  Thus, the Regans were required to establish entitlement to damages for *intentional* emotional distress under the standard set forth by the court in Simon v. Solomon, 385 Mass. 91 (1982),[13] or for *negligent* infliction of emotional distress under the standard set forth in Payton v. Abbot Labs, 386 Mass. 540 (1982).[14]

_____

[13] To recover for intentional infliction of emotional distress as an independent claim, the plaintiff must show the following:
> (1) that the actor *intended* to inflict emotional distress or that he *knew or should have known* that emotional distress was the likely result of his conduct; . . . (2) that the conduct was 'extreme and outrageous' . . .; (3) that the actions of the defendant were the cause of the plaintiff's distress; . . . and (4) that the emotional distress sustained by the plaintiff was 'severe' . . . ." 385 Mass. at 96 (citing Agis v. Howard Johnson Co., 371 Mass. 144-45 (1976)). If each of these elements is proven, the plaintiff can recover for purely emotional suffering unaccompanied by physical injury. Id.

[14] "[A] plaintiff in order to recover for negligently inflicted emotional distress must prove the following: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective syptomatology; and (5) that a reasonable person

Applying the standard articulated by the court in <u>Simon</u>, the Regans produced no evidence whatsoever in response to Beneficial's Motion for Summary Judgment to create a genuine issue of material fact with respect to a claim for intentional infliction of emotional distress.   The Regans did not point to any allegation in their Verified Complaint or elsewhere that Beneficial intended (or knew or should have known that it would cause) emotional distress, that its conduct was "extreme and outrageous," or that their emotional distress was severe.   Additionally, the Regans failed to establish a causal connection between Beneficial's failure to produce a payment history and their emotional distress. Although Beneficial may not have promptly produced a payment history in response to telephonic requests, it did enter into a forbearance agreement with the Regans.  The Court can infer that the stress experienced by the Regans was as much a result of their reduced income from the Debtor's loss of a lucrative job than any conduct on the part of Beneficial. Beneficial did not initiate foreclosure proceedings against the Regans for six months following its payment of their delinquent real estate taxes, and it responded promptly, although not in a particularly helpful or comprehensible manner, to Attorney Kurland's letter.  Moreover, the Regans failed to produce any evidence that Manhattan Financial would have granted them a mortgage loan if it had obtained a timely payment history.

---

would have suffered emotional distress under the circumstances of the case."  386 Mass. at 557.  In <u>Peyton Labs</u>, the court required the objective symptomatology to be substantiated by expert medical testimony, and to be reasonably foreseeable. <u>Id.</u> at 556-57.  It also stated that emotional distress is reasonably foreseeable when there is a causal relationship between the physical injuries suffered and the emotional distress alleged. <u>Id.</u> at 556.

The Regans' payment history produced by Beneficial during the Debtor's deposition shosigwed significant gaps in payment of their monthly mortgage obligation. In particular, the Regans did not make payments in September and October of 2003; March and May of 2004; August and September of 2004; and February through April of 2005. In the June 4, 2007 loan history, only two payments out of the five that the Regans asserted that they had made, and which did not appear on the credit report obtained by Manhattan Financial, were missing. The Regans produced no evidence to show that those two payments were made with good funds. In view of the Regans' loan history, Beneficial's conduct in instituting foreclosure proceedings cannot be said to have been intended to cause them emotional distress given the magnitude and duration of their payment defaults, including their continuing failure to pay real estate taxes.

With respect to a claim for negligent infliction of emotional distress, the Debtor similarly failed to establish the causal connection between the alleged failure to produce a loan history and the emotional distress suffered. Without evidence in the form of an affidavit from a representative of Manhattan Financial that it was prepared to enter into a refinancing transaction with the Regans, but for their failure to timely produce a payment history, regardless of what that payment history actually revealed, Beneficial is entitled to summary judgment on Count VI.

F. Count IV

The Regans demanded damages for breach of the implied covenant of good faith and fair dealing implied in every contract because of Beneficial's "refusing to provide

28

information concerning the plaintiffs' account unless they made payments, thereby depriving the plaintiffs of a fair and full opportunity to resolve the problem without litigation."

The covenant of good faith and fair dealing is implied in every contract.  *See* Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).   The Massachusetts Supreme Judicial Court observed the following in Uno Restaurants:

> The covenant is preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract. The duty of good faith and fair dealing concerns the manner of performance.
>
> The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance. . . .

Id. (citations omitted, footnote omitted).

The Regans failed to submit evidence of how they were damaged by Beneficial's delay in providing a payment history, particularly in view of its response to Attorney Kurland's qualified written request.  The evidence, as opposed to the argument, established that Regan requested a payoff figure and a loan history on November 22, 2005, that Beneficial faxed a loan history, albeit an almost indecipherable one, to Attorney Kurland on January 18, 2005 in response to Attorney Kurland's letter of January 9, 2006, and that Regan filed a Chapter 13 petition on February 9, 2006.  The Regans submitted no evidence that they were not in substantial arrears in the payment of their mortgage at the time they requested the payment history.  The Regans produced no evidence whatsoever to support their assertions that they, in fact, made payments in good funds that were not credited to

their loan account. Their feelings and beliefs that they may have made more payments than Beneficial credited to their account are insufficient to rebut the payment history produced by Beneficial that shows a history of late and missed payments. Moreover, the Regans produced no evidence that, if they had obtained a payment history, they could have qualified for refinancing that would have enabled them to avoid bankruptcy or a foreclosure proceeding. As noted above, they did not submit an affidavit from a representative of Manhattan Financial. Their assertion that they "conceivably could have either refinanced or found a way to pay what *was* actually owed" is speculative, unsubstantiated, and wrong. Regan had the opportunity to address the couple's financial troubles during the 16 months he was in Chapter 13 and was unable to obtain confirmation of a plan or avoid post-petition defaults. It is unclear to this Court what type of relief the Regans wanted from Beneficial short of deferral of all payments required under the note and mortgage as the production of a payment history, in and of itself, was not going to generate income, secure refinancing, or save the couple's house from foreclosure. In sum, the Court finds that the Regans failed to produce evidence sufficient to create a genuine issue of material fact as to the breach of the covenant of good faith and fair dealing.

G. Count I

The Regans demanded an accounting in Count I. In its Memorandum, Beneficial maintained that Count I is moot. The Regans contended that the June 4, 2007 accounting cannot be reconciled with the proof of claim filed in the Debtor's case. The Court agrees. The Court shall enter an order denying summary judgment on Count I.

30

## IV. CONCLUSION

The Court is not unsympathetic to the Regans' position as set forth in their Affirmation. Job loss and health issues, such as the ones disclosed by the Regans, plague many Americans and force them to seek shelter under the Bankruptcy Code. The Regans, however, in responding to Beneficial's Motion for Summary Judgment, were required to do more than articulate grievances. They were required to come forward with evidence to establish the existence of genuine and material issues of fact. They failed to meet that burden. *See* Desmond v. Varrasso, 37 F.3d at 763 n.1. While Beneficial could have responded to the Regans' telephone calls and letters with better customer service, it did not trample or ignore their legally protected rights so as to warrant denial of the Motion for Summary Judgment.

In accordance with the foregoing, the Court shall enter summary judgment in favor of Beneficial and against the Regans on Counts II, III, IV, VI, VII, and VIII. The Court enters judgment in favor of Beneficial and against Regan on Count I. The Court denies summary judgment on Count I as to the Debtor.

By the Court

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: September 22, 2008
cc: David G. Baker, Esq., Michael T. Eramo, Esq., Jeffrey Patterson, Esq., Carolyn Bankowski, Esq., John Aquino, Esq.

31